Filed 8/22/22 P. v. Altamiran CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>OSCAR LEONIDAS ESCOBAR ALTAMIRAN,<br><br>    Defendant and Appellant. | H048789<br>(Santa Clara County<br>Super. Ct. No. C1801282) |

A jury convicted defendant Oscar Leonidas Escobar Altamiran of one count of sexual penetration by force or fear (Pen. Code, § 289, subd. (a)(1)(A))[1] and he was sentenced to six years in state prison.

On appeal, Altamiran argues the trial court erred in instructing the jury that the prosecution need not prove Altamiran had a motive to commit the charged offenses (CALCRIM No. 370). In his view, this instruction impermissibly lowered the prosecution's burden of proof because intent is a necessary element of the crime of sexual penetration by force or fear. The Attorney General argues that Altamiran has forfeited this claim of error by failing to object below and, alternatively, that there was no error, let alone prejudicial error.

As explained below, we conclude that Altamiran has not forfeited this argument, but agree that there was no instructional error. Accordingly, we will affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Procedural history

In October 2019, the Santa Clara County District Attorney filed an information charging Altamiran with sexual penetration by force or fear (§ 289, subd. (a)(1)(A); count 1) and the lesser included offense of assault with the intent to commit a specified felony (§ 220, subd. (a)(1); count 2).

On December 9, 2019, a jury found Altamiran guilty of count 1, sexual penetration of Jane Doe by use of force or fear.[2]  On December 1, 2020, the trial court sentenced Altamiran to the middle term of six years.  The trial court waived various fines, fees, and assessments pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157.

Altamiran timely appealed.

## B. Trial

### 1. Prosecution evidence

#### a. Doe's testimony and police investigation

On the morning of September 19, 2019, Jane Doe was walking her dog past a residential townhouse complex in San Jose.  While walking near a grassy area, she noticed a man, later identified as Altamiran, standing beneath a tree looking at his cellphone.  Doe continued walking, but less than a minute later sensed someone behind her.  With her earbuds in, Doe could not hear very well so she turned around and saw Altamiran behind her with his cellphone pointed at her.  Doe thought Altamiran was "a pervert just taking a picture of [her]" but she did not want to confront him.  She turned around and started walking faster.

Doe had managed to walk another 20 feet or so when Altamiran grabbed her around the waist in a "bear hug."  At first, Doe "thought it was a joke . . . someone wants

___

[2] The jury was instructed pursuant to CALCRIM No. 3519 that if it found Altamiran guilty of the greater crime charged in count 1, it should not reach a verdict on the lesser-included offense charged in count 2.

to . . . grab me and run away." She felt Altamiran's body pressed up against her back and Doe either fell or was pulled to the ground. Doe was in a seated position with her feet and bottom on the ground with her knees bent. Altamiran grabbed her waist with his right hand and reached inside her shorts with his left hand. Doe was not wearing underwear and she could feel Altamiran "fondl[ing] the outer lips" of her vagina before he put "the tips of his fingers" inside.

Doe was trying to "wiggle away" and, less than a minute later, Altamiran let go and ran away. Doe began screaming for help and chased after Altamiran as he ran. As Altamiran ran toward his car, he turned and stopped to look at Doe, which caused her to stop as well. Doe watched Altamiran get into a gold Toyota 4Runner, make a U-turn and drive away. Doe was able to get Altamiran's license plate number.

After Doe lost sight of Altamiran's vehicle, she called the police. Two officers escorted Doe home, then took her to the police station where she spoke with Detective John Tran, a member of the Sexual Assault Investigations Unit at the San Jose Police Department. After Doe described Altamiran's vehicle to Tran, he was able to determine that Altamiran was the registered owner of that vehicle.

That afternoon, Doe underwent a sexual assault forensic examination at Santa Clara Valley Medical Center. Doe told the forensic nurse examiner, Karen Quesada, she had had consensual intercourse the day before, but following the assault earlier that day, she felt " 'tingling to the left side of [her] vagina.' " On Doe's back, Quesada observed a red area that was "beginning . . . [to] bruise" and looked "recent." In addition, Quesada saw redness on the "posterior fourchette that bordered . . . the labia minora" of Doe's vagina. Quesada testified that the findings from her examination of Doe were consistent with injuries from a sexual assault, although the injury could have been caused by consensual intercourse or consensual digital penetration.

Doe returned to the police station the following day and met with a sketch artist. Tran used the sketch and description of Altamiran's vehicle, including the license plate,

to create a flier which was distributed to law enforcement throughout the Bay Area. Later that same day, Tran was notified that the suspected vehicle had been found and Altamiran had been brought to the station to be photographed. Tran contacted Doe and asked her to return to the station that evening so that she could view a photographic lineup.

Detective Palmer, who was part of a different unit, met with Doe and conducted the photographic lineup that evening. After viewing the lineup, Doe told Palmer that Altamiran's photo was "very, very similar" to the man who had assaulted her. Doe said that Altamiran's face was "similar," as he had a "baby face." Doe testified that she did not identify Altamiran "definitively" because she "could not remember . . . the facial hair."

### b. Altamiran's recorded interview

Tran interviewed Altamiran with the assistance of a Spanish-speaking detective, Detective Sandoval. A recording of this interview was played for the jury and admitted into evidence.

Altamiran initially said he was working or driving his family to school or work that day, but eventually admitted he parked by some homes and took a break to watch some squirrels playing on a grassy area. Altamiran suddenly noticed that it was around noon and he was late so he ran to his car and drove to where his boss told him to work. When Tran accused him of leaving things out, Altamiran said that he saw a woman running after him, "taking pictures or video" of him.

After Tran informed Altamiran of how DNA evidence can be transferred and that there are video cameras in many areas, Tran showed Altamiran a picture of Doe. Altamiran initially denied ever seeing Doe before. Tran replied that, if that were true, police would not find Altamiran's DNA on her body. Altamiran asked for some time to think because he has "a really bad memory." Altamiran then admitted he saw Doe walking in front of him and he mistook her for someone he knew from Honduras.

4

Altamiran ran up to her and hugged her from behind. At first, Altamiran said the woman pushed his arms away at which point he realized his mistake and apologized. When she pushed his arms, Altamiran's hands "hit her legs."

Altamiran later changed his story and said that, when he grabbed Doe, he put his hand between her legs because that is how he would "joke with" his friend from Honduras. Doe threw herself to the ground and started screaming. Altamiran apologized and ran away. When Tran asked if Altamiran's hand got close to Doe's groin, Altamiran said his hand was "[c]lose to . . . [her] vagina" and "one of [his] fingers" may have "rubbed there" unintentionally.

### C. Defense case

Altamiran testified that, on the day of the incident, he left his first job site and was heading toward the next work location when he got a phone call. He parked his car and walked over to a grassy area nearby to take the call. While he was on the phone, Altamiran saw Doe walk by him, but he did not see her face.

Altamiran believed that Doe was a close friend from Honduras "from years back."[3] Altamiran called out to her, "Hey, Carolina," and began walking after her. When he got close, Altamiran tried to "mess around" with her, as he always did with Carolina, and grabbed her around her waist from behind with his left arm, while using his right hand to grab her behind her knee.

When he reached for her knee, Doe fell to the ground and his right hand made contact with her groin, over her clothing. Altamiran first said he did not touch her genitals or vagina, but then said he might have, but he did not recall his finger touching her vagina or that the incident happened the way Doe testified. Altamiran denied ever touching Doe's skin or moving his fingers to grope her vagina.

---

[3] On cross-examination, Altamiran said that he had not seen his Honduran friend, Carolina, since he came to the United States about a "year [or a] year and a half before" the incident.

Doe fell to the ground and began screaming, and as she turned toward him, Altamiran realized it was not Carolina. Altamiran apologized to Doe, saying he thought she was a friend of his, and then ran to his car and drove away.

The defense also called three character witnesses each of whom testified that they believed Altamiran was a truthful person and they did not believe he had a sexually deviant character.

## II. DISCUSSION

Altamiran argues that CALCRIM No. 370, which informed the jury that the prosecution need not prove that he had a "motive to commit" sexual penetration by force or fear, impermissibly lowered the prosecution's burden of proof in violation of his federal constitutional rights because, according to Altamiran, motive was an element of that crime. The Attorney General first argues that Altamiran forfeited this claim by failing to object to the instruction below, but alternatively argues that there was no error because it is not likely the jury would have understood CALCRIM No. 370 to mean that the prosecution need not prove that Altamiran committed the offense for a sexual purpose. We disagree with the Attorney General on the forfeiture issue, but as discussed below, conclude that there was no instructional error.

### A. Relevant legal principles

"In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. [Citation.] Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.) "If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Ibid.*)

"It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the

6

trial record." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) "In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' [Citation.] '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

### B. Additional background

Following the close of evidence, the trial court instructed the jury with the elements of the charged crimes and applicable law. As part of its general instructions, the court initially informed the jury that the crime of sexual penetration by force or fear "require[s] [proof of] a specific intent or mental state[] . . . [and] to find a person guilty of th[is] crime[], that person must not only intentionally commit the prohibited act, but it must do so with a specific [intent] or a mental state." The court subsequently instructed the jury pursuant to CALCRIM No. 370 that "[t]he People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict, you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

As part of the specific instructions, the court first provided the jury with the statutory elements of the crime of sexual penetration by force or fear (§ 289, subd. (a)(1)(A); count 1) and instructed that the term "sexual penetration" "means penetration, however slight, of the genital or anal opening of the other person for the purpose of sexual abuse, arousal or gratification." As to intent, the court told the jury that, to be guilty of that offense, the "[defendant] must not only intentionally commit the prohibited act, but [he] must do so with a specific [intent] or a mental state." Finally, the

7

court instructed that the jury could not find Altamiran guilty on that charge "if he acted without the intent required for th[at] crime[] but acted instead accidentally."

Defense counsel's final argument discussed the importance of Altamiran's mental state with respect to count 1, telling the juror's that this charge "require[d] that [Altamiran had] in his mind [the] specific intent of touching [Doe] sexually for his own gratification." After reminding the jurors that Doe testified, "at first I thought it was a joke," defense counsel said they could "find[] that the district attorney has not established that [Altamiran] had the specific intent to sexually touch [Doe]."

On rebuttal, the prosecutor agreed with defense counsel that in order for the jury to find Altamiran guilty on count 1, the prosecution was required to prove that Altamiran had the specific intent to "touch [Doe] for a sexual purpose." She then reminded the jury that Altamiran conceded during his testimony that "when someone touches a woman's vagina skin to skin, that's sexual."

During deliberation, the jury sent out a question asking whether there were "legal definitions for sexual arousal, sexual gratification, and sexual abuse." After discussing the question with the parties, the court responded with the following: "Sexual abuse means any touching of a person's intimate parts in order to cause pain, injury, or discomfort. The perpetrator does not need to achieve any sexual arousal or sexual gratification." "With respect to sexual arousal and sexual gratification, please refer to CALCRIM No. 200."[4]

### C. There was no forfeiture of instructional error claim

The Attorney General argues that Altamiran has forfeited his claim of instructional error "by failing to make a timely objection to the motive instruction below." He relies on the principle that a party may not argue on appeal that an instruction correct in law

---

[4] CALCRIM No. 200 provides, in relevant part, that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

8

and responsive to the evidence was improper without first requesting clarification or objecting to that instruction at trial. (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) However, Altamiran is arguing that the motive instruction contradicted the specific intent instructions, thus impermissibly reducing the prosecution's burden of proof on a necessary element of the offense.

Under section 1259, "[t]he appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." Thus, regardless of his failure to object to the motive instruction, this court may review Altamiran's claim of instructional error to the extent substantial rights were affected. (See *People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) If Altamiran is correct in asserting that contradictory instructions likely misled the jury to believe that the prosecutor did not need to prove that he had the specific intent to commit sexual penetration by force or fear when he committed the assault on Doe, the alleged error would have affected his substantial rights. (See *People v. Johnson* (2015) 60 Cal.4th 966, 993.) Accordingly, Altamiran's claim of instructional error was not forfeited. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 (*Hillhouse*).)

### D. The trial court did not err by instructing the jury with CALCRIM No. 370

Altamiran argues with regard to the meaning of "sexual purpose" and "motive" "there is a reasonable likelihood the jury applied the motive instruction [CALCRIM No. 370] in determining the so-called 'purpose element' " which would have reduced the prosecution's burden of proof on that element. He maintains that the motive and sexual purpose instructions were contradictory because "[o]ne who intends to commit such an act [i.e., sexual penetration by force or fear] is motivated by sexual interest." We disagree.

In *Hillhouse*, *supra*, 27 Cal.4th 469, the California Supreme Court made clear that the words "motive" and "intent"[5] are separate and distinct mental states and they are not synonyms. (*Hillhouse*, *supra*, at p. 504.) "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*Ibid*.) In *Hillhouse*, the defendant had argued that "telling the jury that motive is not an element of the crimes contradicted the other instructions, because motive [was] an element of the various crimes." (*Id*. at p. 503.) The Supreme Court concluded that "although malice and certain intents and purposes [were] elements of the crimes . . . , *motive* [was] not an element." (*Id*. at pp. 503-504.)

More recently, in *People v. Miles* (2020) 9 Cal.5th 513, the California Supreme Court reaffirmed that motive and intent (or purpose) are distinct concepts. The defendant in *Miles* was convicted of multiple offenses, including penetration by a foreign object in violation of section 289, subdivision (a). (*Miles*, *supra*, at p. 580.) On appeal, the defendant argued that the trial court's instruction that "motive was not an element of this offense" "effectively negated" the trial court's specific instruction that the penetration " 'was done with the purpose and specific intent to cause sexual arousal, gratification or abuse.' " (*Ibid*.) The Supreme Court unequivocally rejected that argument, stating: "We have made clear, however, that motive is not an element of an offense merely because the offense requires a particular purpose or intent. (See, e.g., *Hillhouse*, *supra*, 27 Cal.4th at pp. 503-504.) Accordingly, motive was not an element of the penetration by a foreign object charges simply by virtue of the charges requiring a particular 'purpose and specific intent.' " (*Id*. at pp. 580-581.)

Altamiran argues that *Hillhouse* is distinguishable because the defendant in that case was not charged with a violation of section 289, but instead faced charges of murder,

---

[5] In the context of the offense of sexual penetration by force or fear the perpetrator must have the specific intent to commit the act for a sexual "purpose." (§ 289, subd. (k)(1).)

robbery, and kidnapping for robbery. We fail to see how the nature of the charges impacts *Hillhouse*'s instruction that "motive" and "intent" are not synonyms and describe " 'separate and disparate mental states.' " (*Hillhouse*, *supra*, 27 Cal.4th at p. 504.)

Altamiran's attempt to distinguish *Miles* is no more persuasive. He argues that *Miles* is inapposite because, in that opinion, "the Supreme Court was not tasked with addressing the argument appellant makes here. That is, the Court was not determining whether there was a reasonable likelihood that the jury would have applied the motive instruction to the purpose element of the section 289 count." We fail to see the distinction that Altamiran is pointing out. In both this case and in *Miles*, the trial courts instructed the juries about the sexual purpose element necessary to find a violation of section 289, subdivision (a) and further instructed the jury that motive was not an element of that offense. In both this case and in *Miles*, the appellants argued that the motive instruction negated the sexual purpose element. While the Supreme Court did not phrase its analysis of the instructions in precisely the same way Altamiran has here, the conclusion it reached on the matter is clear: the motive and sexual purposes instructions do not conflict nor is it reasonably likely that a jury would misapply them.

Altamiran relies on *People v. Maurer* (1995) 32 Cal.App.4th 1121 (*Maurer*) for the proposition that reversal is required where the trial court provides "conflicting instructions on the mental state element." *Maurer* is distinguishable.

The defendant in *Maurer* was convicted of annoying or molesting a child in violation of section 647.6, a statute the *Maurer* court itself recognized "is a strange beast." (*Maurer*, *supra*, 32 Cal.App.4th at p. 1126.) "As noted in *People v. Pallares* [(1952)] 112 Cal.App.2d [Supp. 895] at page Supp. 901: 'Although no specific intent is prescribed as an element of this particular offense, a reading of the section as a whole [then section 647a] in the light of the evident purpose of this and similar legislation enacted in this state indicates that the acts forbidden are those *motivated* by an unnatural or abnormal sexual interest or intent with respect to children.' (Italics added.)" (*Id.* at

11

pp. 1126-1127.) Consequently, "[t]here is no doubt that in proving the mental state element of the section 647.6 offense, the prosecution must show that the acts or conduct 'were motivated by an unnatural or abnormal sexual interest.' " (*Id.* at p. 1127.) Because the particular offense at issue in *Maurer* required that the prosecution establish the defendant was " '*motivated* by a[] . . . sexual interest' " it was error to also instruct the jury in that case that " '[m]otive is not an element of the crime charged and need not be shown.' " (*Ibid*.) Such conflicting instructions would undoubtedly confuse a jury.

We have no such conflict here, though. There is no mention of "motivation" in the instructions relating to sexual penetration by force or fear, and CALCRIM No. 370 did nothing more than inform the jury that "motive" was not an element of that offense. In this case, "the instructions as a whole did not use the terms 'motive' and 'intent' interchangeably, and therefore there is no reasonable likelihood the jury understood those terms to be synonymous." (*People v. Cash* (2002) 28 Cal.4th 703, 739.)

Moreover, the assumption that counsel's arguments clarified an ambiguous jury charge is " 'particularly apt when it is the *prosecutor*'s argument that resolves an ambiguity in favor of the *defendant*.' " (*People v. Mills* (2012) 55 Cal.4th 663, 680.) In closing argument, the prosecutor acknowledged that, for the jury to find Altamiran guilty of sexual penetration by force or fear, she had to prove that Altamiran intended to "touch [Doe] for a sexual purpose" and that was "the only intent [she has] to prove for Count 1, that it was a sexual purpose." At no time did the prosecutor argue to the jury that she need not prove Altamiran's motive to commit the offense nor did she otherwise seek to conflate the concept of motive with that of sexual purpose.

Viewing the record as a whole, and considering the instructions in context, there is no reasonable likelihood that the motive instruction misled the jury or caused it to apply the instruction in a way that violated Altamiran's constitutional rights.

12

## E. Assuming the trial court erred, the error was harmless

Even if we were to conclude that the trial court erred in instructing the jury with CALCRIM No. 370, such error was harmless under *Chapman v. California* (1967) 386 U.S. 18, 24. "An instruction that omits a required definition of or misdescribes an element of an offense is harmless only if 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 774.)

In addition to instructing the jury that the prosecution need not prove Altamiran had a motive to commit the charged offenses, the trial court further instructed the jury it must find that Altamiran committed the crimes "for the purpose of sexual abuse, arousal or gratification." The jury was also instructed that it must find the "[defendant] . . . not only intentionally commit[ed] the prohibited act, but [he] . . . d[id] so with a specific [intent] or a mental state," and that it could not find Altamiran guilty "if he acted without the intent required for th[at] crime[] but acted instead accidentally."

No reasonable juror would have construed the instructions as a whole to mean that Altamiran could be convicted without finding beyond a reasonable doubt that he grabbed Doe and inserted his finger in her vagina for a sexual purpose. The prosecutor never mentioned CALCRIM No. 370 to the jury, but instead focused on her burden of proving Altamiran's specific intent. Juries are presumed to follow the instructions given, and therefore it can be presumed the jury found Altamiran acted with sexual purpose. (*People v. Van Winkle* (1999) 75 Cal.App.4th 133, 148.) Accordingly, any error in instructing the jury with CALCRIM No. 370 was harmless.

### III.    DISPOSITION

The judgment is affirmed.

_____
                Wilson, J.


WE CONCUR:




_____
    Bamattre-Manoukian, Acting P.J.




_____
          Danner, J.




People v. Altamiran
H048789